## INTERNATIONAL TRADING CO. OF AMERICA v. JOHN SEXTON & CO.

Circuit Court of Appeals, Seventh Circuit. December 13, 1927.

Rehearing Denied March 6, 1928.

No. 3871.

1. **Evidence ⟨key⟩400(4)—"Contract of sale" is complete statement of agreement; "memorandum of sale" is note informally made of agreement.**

A "contract of sale" is a complete statement of agreement of parties; whereas a "memorandum of sale" is understood to be a note or minute informally made of agreement, as respects parol evidence rule.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract of Sale; Memorandum.]

2. **Evidence ⟨key⟩385—Oral testimony is admissible to explain that which is imperfectly expressed in writing, but not to deny plain import thereof.**

Where party seeks to deny plain import of writing, which reveals no uncertainty in meaning, even when viewed in connection with circumstances of its making, rule of substantive law, which declares that all prior extrinsic matters are merged in writing, governs; but, where he seeks merely to explain that which is imperfectly expressed, rule of merger is not violated by introduction of explanatory or clarifying oral testimony.

3. **Evidence ⟨key⟩457—Parol evidence held admissible to explain meaning of "standard white granulated sugar" in sales contract.**

Where sales contract sued on provided for sale of "standard white granulated sugar," which was to be shipped from Hong Kong, and defendant buyer claimed sugar tendered was not that called for by contract, parol evidence held admissible to explain meaning of term quoted, since evidence showed that term meant one thing in America and in certain foreign countries, and another thing in other foreign countries, and therefore term was ambiguous.

4. **Sales ⟨key⟩68—Statement, "Quality and net shipping weights guaranteed by Lloyds or Hong Kong government certificates," in sales contract for "standard white granulated sugar," did not define last quoted term.**

Paragraph reading: "Guarantees—Quality and net shipping weights guaranteed by Lloyds and Hong Kong government certificates. Inspection and analysis attached to invoice and documents, and sugar to be in double sack"—in contract for sale of "155 tons standard white granulated sugar at $23.50 per 100 pounds,

f. o. b. Seattle, American funds," did not define article "standard white granulated sugar," but two paragraphs should be read together.

5. **Sales ⟨key⟩88—In seller's action against buyer refusing sugar, evidence did not raise jury question regarding meaning of "standard white granulated sugar," in sales contract.**

In action to recover purchase price of sugar tendered by plaintiff and refused by defendant on ground that "standard white granulated sugar," specified in sales contract, was grade known to American trade by that term, and that sugar tendered was not grade called for, evidence *held* not to present jury question as to meaning of term quoted.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by the International Trading Company of America against John Sexton & Co. Judgment for defendant, and plaintiff brings error. Affirmed.

Walter E. Beebe, of Chicago, Ill., for plaintiff in error.

Henry S. Blum, of Chicago, Ill., for defendant in error.

Before ALSCHULER, EVANS, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Plaintiff in error brought this action to recover the purchase price of certain sugar tendered by it and refused by defendant. At the close of the testimony, the court directed a verdict for defendant, and a judgment in its favor followed. Plaintiff then prosecuted this writ, insisting that there was error in the reception and rejection of evidence and in directing a verdict for defendant; also in refusing to direct a verdict in its favor. The contract sued upon reads:

"Merchandise Contract.

"Seller—International Trading Company of America, Inc., Seattle, Washington.

"Buyer—John Sexton & Co., Chicago, Illinois.

"155 tons Standard White Granulated Sugar at $23.50 per 100 pounds, fob Seattle, American Funds.

"Terms—Net cash, irrevocable letter of credit to be established through the Seattle National Bank, Seattle, Washington, Negotiable against Ocean documents.

"Guarantees—Quality and net shipping weights guaranteed by Lloyds and Hong Kong Government Certificates. Inspection and Analysis attached to invoice and documents, and sugar to be in double sack.

"Shipment—Immediate shipment from Hong Kong, China.

"It is understood this sale is made against specific contract which we hold for this amount of sugar and that we will not be held responsible for short or nondelivery account of causes beyond our control."

When plaintiff tendered the sugar with the government certificates attached, defendant refused to accept it, on the ground that the "standard white granulated sugar" specified in the contract was the grade known to the American trade by that term.

Plaintiff's position is fairly set forth in its telegram of July 15th.

"John Sexton & Co., Chicago, Illinois. We are supply sugar exactly according to contract Lloyds and Hongkong certificates read standard white granulated sugar but after standard have the words grade Java inserted. This on purpose to differentiate between American Standard White and Foreign Standard White stop There is no sugar grown in Hongkong all sugar shipped from Hongkong is grown in Java shipped to Hongkong and refined there after which it is still called Java sugar and standard grade Java white granulated sugar from Hongkong is the standard of Hongkong sugar the sugar tendered is exactly the same quality sugar now on Edmore for you we are living up strictly to terms of contract but bank here must receive notice to pay draft when accompanied by documents reading as per our telegram tenth you have misinterpreted the kind of sugar we are tendering answer immediately. International Trading Company of America. Ind. Paid."

The controversy, it will thus be seen, centers around the meaning of "Standard White Granulated Sugar," as used in the contract.

Each official certificate signed by the Lloyd agents and the Hong Kong government representatives described the sugar shipped as "Granulated White Sugar (Java 24) Direct Polarization, 98.5 per cent."

The precise question before us is: Was the delivery of "granulated white sugar (Java 24) direct polarization 98.5 per cent." the delivery of the bartered article? The evidence conclusively established that "Standard White Granulated Sugar," as that term is used in the United States, is a sugar refined by the bone char process, polarizing at 99.5 per cent. or better, and pure white. It further showed that no sugar is refined in Java, but all sugar is shipped to Hong Kong where it is treated; that Java sugar is there graded; that Java 24 is a high grade of Java sugar, washed and called white. It is more brownish than the white sugar used on the tables in the United States;—a cane sugar,

washed but not refined. Plaintiff insists it was this sugar that the contract described.

Defendant offered parol evidence to clarify the meaning of this term, or at least to make it clear that American white granulated sugar was the subject of the contract. Three witnesses testified the sugar was "to be equal to that of any American refined sugar." Lee, who represented plaintiff, testified:

"In May, 1920, I was a canned foods broker, in the employ of C. L. Jones & Co., of Chicago. The signature, J. A. Lee, on Plaintiff's Exhibit 2 in this case is my signature. * * * I met Mr. C. F. Buelow in May, 1920; the same party whose name appears on such Exhibit. I made the sale of the sugar to John Sexton & Co. myself. I talked to Mr. O'Leary of John Sexton & Co. in connection with the sale of the sugar.

"Q. What, if anything, did you say to Mr. O'Leary about the sugar?

"Mr. Beebe: I object to that as wholly immaterial; as an attempt to vary, change, or alter the terms of a written instrument.

"The Court: It will be admitted. * * * (Exception.) * * *

"A. I said to him that I was authorized to state that the sugar was manufactured in Hong Kong by a British refinery, the Kelley Company, I think was the name; that I was authorized to state that the quality of the sugar was equal to that of any United States or American refined sugar; that it would be shipped promptly and the price, I think, was 24⅜ or 24.5, probably at San Francisco; that the sugar was packed 100 pounds in a bag; that the terms were irrevocable letter of credit against a sight draft."

Von Kessler testified:

"About that time Mr. Lee opened up negotiations with the John Sexton Company for a portion of the sugar. I questioned Mr. Buelow at the time he knew about sugar. He said 'Very little.' I asked him what he was offering, and he stated that he was offering a standard white granulated sugar. I asked him where it was from. He said Hong Kong. I asked him what he knew about the quality of it, and he said the quality was superior to that produced by American refineries."

Station testified:

"I was asked to go out with Mr. Buelow to some of my trade to make a sale of this sugar that was offered. The sugar was offered from a refinery from Hong Kong. This refinery was supposed to be owned by some British concern. I believe it was Kelley, Ltd., and they were supposed to refine sugar after the same methods that we do here, in the states; that this sugar was to be

equal in quality, if not better, as our own sugar here. On those bases I went out and sold the sugar."

[1] Plaintiff insists that this evidence should not have been received; that the contract was clear and unambiguous without it.

There is a great difference between the admissibility of extrinsic evidence to *explain* that which is written and the admissibility of such evidence to *contradict* that which is written. Likewise there exists a difference between a contract of sale and a memorandum of sale. Williston on Sales, vol. 1, p. 168. The former is a complete statement of the agreement of the parties. A memorandum is understood to be a note or a minute informally made of the agreement. Naturally there is much more likelihood of ambiguity lurking in a memorandum than in an agreement. And this is particularly so where the memo deals with a commercial transaction respecting which trade-names and customs have arisen.

[2] It is elementary that, where a party seeks to deny the plain import of a writing which reveals no uncertainty in meaning even when viewed in connection with the circumstances of its making, the rule of substantive law, which declares that all prior extrinsic matters are merged in the writing, governs; but, where he seeks merely to explain that which is imperfectly expressed, the rule of merger is not violated by the introduction of explanatory or clarifying oral testimony.

The difficulty of applying these rules to the facts in the instant case arises out of the difference in contentions that are made respecting the agreement.

Plaintiff contends that the term "standard white granulated sugar" is defined by the paragraph entitled "Guarantees." In other words, many cases are cited to support the position that where parties agree that the quality of a thing sold shall be determined by a particular person holding a particular position such determination is conclusive. Likewise, where parties deal with reference to a particular market, they will be conclusively presumed to have dealt according to the known general customs and usages and trade phraseology of that market whether known or not.

These contentions may well be conceded. It may be that defendant could not repudiate nor question the certificates of the Hong Kong government (except for fraud, collusion, etc., not here present), provided such certificate followed the language of the contract. Nor can defendant urge that the customs and usages of the Hong Kong government did not apply, provided his contract made such customs and usages a part thereof.

But we are confronted with a matter of phraseology—the meaning of trade-names. This is well illustrated by the certificates furnished. These certificates are not in the language of the contract. First, the word "standard" is omitted. Then the expression "Java 24" is added, and finally "Polarization 98.5 %" is added. What do they mean? Without explanation they are nonunderstandable to those not familiar with the sugar trade. Plaintiff offered evidence to explain "Java 24." Both parties offered some evidence to explain "Polarization 98.5%," and also the polarization percentage when sugar is refined in the United States—99.5 per cent. or better.

In construing this contract we should not confuse the second and fourth paragraphs of the memorandum. They deal with different subject-matters. The fourth deals with the subject of "Guarantees." A certificate by the Hong Kong government respecting quality and net shipping weight is required. But what quality? The fourth paragraph does not define the quality. Quality, as here used, refers to the subject-matter, sugar, and the grade thereof, as defined by paragraph 2.

The oral testimony shows conclusively that the term "Standard White Granulated Sugar" means one thing in America, the same thing in certain foreign countries, and another thing in other foreign countries. What "Standard White Granulated Sugar" was intended? Surely it was not left for the Hong Kong government agency to determine.

There is some evidence that in Hong Kong some Java sugar is received and there refined as in the United States. Doubtless the amount of such sugar is small compared to the amount that is not refined. Yet its existence only emphasizes the ambiguity of this term.

[3] Applying the foregoing observations to the case at hand, it is apparent that we have a clear case of latent ambiguity. 4 Jones, Com. on Evidence, §§ 1542, 1545. For a situation is disclosed where one term applies to two different articles of merchandise, or rather to different grades of an article of merchandise. There being a latent ambiguity, parol evidence should be received to explain it i. e., identify the grade of article intended (Jones, Com. on Evidence, § 1544)—unless in doing so other provisions of the agreement are contradicted (Jones, Com. on Evidence, § 1545).

[4] In other words, parol evidence to explain

the meaning of "standard white granulated sugar" was receivable, unless that term is specifically defined (expressly or by implication of law) by the fourth paragraph of the contract. Does this paragraph define the commodity sold? It deals with "guarantees." This term as here used is somewhat ambiguous. If used in its strict sense, it indicated that the paragraph dealt with the subject of guaranty. A reading of the paragraph, however, shows that no one was guaranteeing quality or weights. It cannot be seriously argued that the Lloyds or the Hong Kong government were to execute a guaranty on behalf of the sellers. Rather does it seem to us that this paragraph called for certificates which were to set forth what the inspection disclosed as to weights and analysis of the sugar. If any other construction were given it, then plaintiff utterly failed to produce the guaranty called for.

Our conclusion is that the fourth paragraph of this contract did not define the article "standard white granulated sugar," but that the two paragraphs should be read together. In other words, paragraph 4 called for a certificate which defined the quality, net shipping weight, and analysis of the sugar which plaintiff imported. Whether it was the article purchased was another question, determinable only by paragraph 2, which in turn was clarified and made certain as to its meaning by the testimony of the two parties who negotiated the sale, both of whom testified to a common understanding of the meaning of "Standard White Granulated Sugar."

Plaintiff further contends that its broker had no authority to guarantee the quality of the sugar sold. Ignoring for the moment the question of the implied authority of an agent authorized to sell such an article as sugar to warrant its quality, there are two answers to plaintiff's contention. First, if the broker had no authority to sell the article upon which the minds of the parties met, then no binding contract was made; second, the evidence here received bore, not upon warranty, but merely threw light on the meaning of a trade term possessing a plurality of meanings, and which was not understandable, outside of the trade, until it was explained by such oral testimony.

[5] There remains but one further question, the disposition of which calls for an examination of certain evidence to ascertain whether a jury question was involved as to the meaning of the term used. The testimony of the three witnesses was quoted to show that the broker representing the plaintiff and the buyer's agent agreed as to the meaning of "Standard White Granulated Sugar." Plaintiff's position is that the parties did not, and could not, have so understood the term, for, subsequent to making the sale, the broker wired plaintiff asking that the contract be modified by inserting a clause therein as follows: "Quality guaranteed equal American refined sugar." We think this evidence tends to confirm, rather than dispute, the testimony of the three witnesses. The purpose of this telegram was to make clear the understanding of the parties who negotiated the sale as to the meaning of an ambiguous term that had been used by them.

The judgment is affirmed.